The Assistant Vice-Chancellor.
The defendants, who are children of Thomas Carter, are seised in fee of the premises in question, by force of his conveyance to Stiffen, in 1829. The complainants, by their bill, set up a lien upon the property, acquired by the mortgage executed by Clason and others, in January, 1837. The defendants did not execute the mortgage, and were, at that time, incapacitated by infancy. The complainants, in order to establish that the mortgage was valid, as to the infants, and created a lien upon their interest in the property ; stated in their bill, the order of the Vice-Chancellor directing its execution.
, This order, therefore, is the basis of the claim made by the bill, and, so far from its being brought into the suit collaterally, its validity forms the principal issue upon which that claim must be substantiated.
The order is vindicated, on the inherent right of the court of chancery, as the general guardian and protector of infants, to *16 authorize such disposition of their equitable real estate, as may ■ be deemed most beneficial to the infants.
It is said, on the other hand, that the interest of the infants, when the order was made, if they had any vested interest, was a legal estate, and that the trustee had no estate, except during the life of Mrs. Artois.
I think, however, that the trustee was then vested with the whole legal estate, and that the infants interest, whether vested or contingent, was equitable.
Next, it is objected, that the order of the court was in contravention of the trust, and was, therefore, void, both as beyond the power of the court, and as prohibited by the revised statutes.
The complainants argue, that the statute has no application to trusts which were in existence when it went into operation. That such is the import of its terms, and it should not be construed to act upon existing rights, unless the intention, that it should so act, is expressly declared.
As to this, there is nothing express in the statute, either one way or the other ; and I do not perceive how any existing rights would be infringed, by holding that it restrained the court of chancery from directing an act in contravention of a subsisting trust.
But it is needless to speculate on this proposition, because I do not understand that this court has ever knowingly sanctioned, much less directed, an act by a trustee, in contravention of a trust reposed in him by a deed or conveyance.
This being an equitable estate, to which these infants were presumptively entitled to succeed, on the death of Mrs. Artois, it was within the established jurisdiction of this court to authorize the-trustee to dispose of it, as might by the court be deemed most beneficial for the infants; provided the rights of others should not be injured by such disposal. The Vice-Chancellor thus had jurisdiction of the subject matter, and he exercised the discretion and judgment with which he was clothed. It is not my province to review his decision, either on the facts involved, or the law which was applicable to them. Even if I were satisfied that he erred so far in point of law, as to direct a disposition which contravened the trust itself, I do not think that I could *17 disregard or interfere with his act. How that might he, in a tribunal superior to his, and in a proceeding like this, is foreign to the case.
Conceding that the court had jurisdiction to make the order, and that the judgment of the 'Vice-Chancellor, in exercising it, ought not to be questioned in this suit; the next objection to its validity is, that it was fraudulently obtained, by representing to the court, in the petition, and to the master, on the reference, (upon whose judgment, embodied in his report, the court acted,) that the premises were entirely unproductive, would yield no revenue as they then were, and were liable to be charged with taxes and assessments, when in truth, they were yielding a rent of $3000 a year, secured for six years to come, from responsible tenants, who were bound to pay all the taxes and assessments.
1 consider this an important point, and will examine it in detail.
That such a representation was made to the court, is shown by the production of the petition itself. The master’s report shows that no different statement was brought before him. I cannot presume that a master of such acknowledged intelligence and fidelity, would have made a report, wholly omitting to mention the leases, if their existence had become known to him. Now, was the representation untrue? I entertain no doubt about it. Though the lessors had no legal title, they had the entire equitable right to the income, so long as they lived ; and their act had been so long and so repeatedly sanctioned and affirmed by both trustees, that had Clason attempted to regain the possession by an ejectment, this court would have restrained him, and upheld the leases. And the lessees would not, in an action for the rent, have been permitted to set up title out of the lessors, until they had been dispossessed by such title. The fact that the premises were actually held under those leases, after the stores were rebuilt, and to the end of their terms, speaks volumes in regard to their validity, as well as the opinions in that respect entertained by the various parties then interested in the property. It will not be denied, that on an application to the sound discretion of the court, for permission to mortgage the fee of the land for the erection of stores, the immediate benefit *18 of which was to enure mainly to the equitable tenant for life; it was a very material, nay, a vital point, that the court should be correctly informed as to the existing income of the property, and its extent and duration. Nor can it be supposed for a moment, that the court, on learning that responsible tenants were liable for a rent of $3000 a year, and nil taxes and assessments for six years to come, and were entitled to hold the premises at that rent, whether rebuilt or vacant; would make the same order, or any such order, on the subject, that it would make on being informed that the premises were vacant, unproductive, and likely to be heavily assessed, and that, when built upon, they would yield $4000 or $5000 a year.
While, under the circumstances last mentioned, the court might well deem it highly advantageous to the beneficiaries, both present and future, to incur a charge on the property of $14,500, and even $20,000, for buildings; it would probably in the circumstances which actually existed in this case, have left it to the tenants to rebuild, at their own expense ; a course most obviously dictated by their own interest, they being liable for $3000 a year, at all events, and especially if, as the petition and report state, the new erections would yield a much larger rental.
There was not only a misrepresentation to the court in this most essential particular, but the omission to set forth the existence and situation of the demises, must have been intentional, and not the result of accident.
With whatever view or motive, or by whom, the thing was done, these circumstances, in the judgment of law, constituted a fraud against the infants, in obtaining the order to mortgage.
The next inquiry is, were the mortgagees cognizant of the fraud, and, if they were, are the complainants affected by it ? The mortgagees, as lessees in possession, knew all the facts in respect of the demises. They were fully aware that an application for an order to mortgage the lots, for the purpose of rebuilding the stores, was pending before the Vice-Chancellor, and one of them testifies to his impatience at the delay which intervened in perfecting the mortgage. The agreement which they made, to rebuild and receive the mortgage therefor, was one which they were bound to know, was far more for their benefit than *19 for that of the owners of the inheritance. But aside from that, the mortgage itself derived its whole vitality from the order of the court, which is set forth in it, verbatim; and in which is recited the master’s report, stating the false ground for his opinion, that the premises were entirely unproductive. The report also stated, that the material facts contained in the petition were true - and as those facts were necessarily the basis of the whole action of the court, I think the parties, relying upon the order to mortgage, must be deemed to have had notice of the statements contained in the petition on which it was founded. Indeed, such parties could not be assured that the court had jurisdiction, without an examination of the petition. Thus, Seaman and Goold either knew, or were chargeable with notice, that in obtaining the order, there had been a fraudulent representation of material facts made to the court. They were bound to take notice of what had been stated and omitted, and they actually knew of the facts omitted, and of the falsity of those which were stated.
The mortgagees being chargeable with notice of the fraud, their assignees are also subjected to its influence. Both Pitcher and Pollard contracted for an interest in the mortgage, as an existing security in the hands of Seaman and Goold ; and on succeeding to the rights of the latter, they received them, subject to all the equities which had attached to those rights in favor of the ostensible mortgagors. The other parties who derived their title from Seaman and Goold respectively, are also affected by the same equities. (Clute v. Robinson, 3 John. 485; James v. Morey, 2 Cowen, 247.)
If I am right in my conclusions, the result is, that the order to mortgage was fraudulently obtained, and was void as against the infants ; Seaman and Goold took the mortgage, with notice of the fraud ; it was inoperative in their hands, in respect of the infant’s title ; and their assignees have no better right than they had, to enforce the mortgage against the defendants.
This disposes of the cause, but as I have considered another of the principal points, I may as well briefly state my opinion upon that also, because, if it stood alone, it would bring the suit to the same termination.
The authority conferred upon Mr. Clason was, to raise money *20 upon the premises by a mortgage or mortgages. The whole scheme, as presented to, and as sanctioned by the court, was to raise money; to mortgage the lots for money, which money- was to be laid out in erecting buildings, and paying off the prior liens. There was no authority whatever for the guardians to contract for the erection of buildings to be paid for in a mortgage having several years to run. The buildings were to be paid for in cash, and the mortgages were to be given upon borrowing the cash, and for no other purpose. If the trustee found that he could not borrow the money on such a security, he should have desisted, or else have reported the facts to the court. That result furnished no justification or excuse, for executing a mortgage on terms and for objects which the court never authorized. It is no answer to this to say, that he accomplished the object of the court by an indirect mode, which was just as beneficial for the estate. The court will not enter into any speculative inquiry of the kind, and grope about in the mists in which nine or ten years have involved the transaction, in order to see whether the proceeding which it did not authorize, was as advantageous as the one which it sanctioned. The authority granted, was a plain one. It did not allow the giving a mortgage for a building, probably because of the very obvious reason, that a building, to be paid for at a distant day, would cost the infants more than a building to be paid for in cash, as the work progressed,
The trustee under this authority to raise money, executed a mortgage for work, labor and materials. The simple statement of the proposition, suffices to show that the mortgage was not in pursuance of the order ; and it is, therefore, not supported by the order.
The parties apparently understood the necessity of at least an outward compliance with the terms of the order; for the mortgage recites in due form, that Seaman and Goold have loaned and advanced the $14,500 to Clason.
Upon this point, there is no denial that the mortgagees were acquainted with all the facts ; and the holders of the mortgage are affected by those facts, precisely as any assignee is affected *21 by proof of the want of consideration in the mortgage which he claims.
It is asked by the complainant’s counsel, are these builders to lose all that they have expended, and the defendants to reap the benefit of the erections without paying anything 1 And the leading counsel insisted that the defence should be rejected, because of the defendant’s acquiescence, and their omission to file a cross bill bringing Glason before the court with these parties, so as to have complete justice done to all.
It is undoubtedly a hard case upon the builders, who so far as I have seen, acted in entire good faith, and honestly performed their contracts. But they were by law chargeable with all the defences existing to this mortgage in favor of the infants ; and they dealt with it at the same peril which every man encounters, who purchases a mortgage or other security not negotiable. Whether they have any remedy, it is not for me to say in this cause. Their bill is filed to foreclose the mortgage. It sets up no other demand against the defendants, and on the mortgage proving invalid, the suit fails. In order to warrant the court in deciding upon their supposed equities, growing out of what has been done in reliance on the mortgage, and its benefits to the defendants ; a case must be brought forward founded upon all the circumstances on which the complainants suppose they are entitled to relief, and the usual opportunity given to the adverse parties to be heard in their defence.
The case of Galatian v. Cunningham,, 8 Cowen, 361, shows that a cross bill would not have been proper here. And as to acquiescence, the defendants on becoming entitled to the possession of the lands and taking such possession, did not thereby in any sense ratify any unauthorized erection which had been made upon the property. A man who takes possession of a house, built without his knowledge on his vacant lot, incurs by the act, no liability to pay for such building.
The bill must be dismissed with costs, but without prejudice to any legal or equitable remedies, other than on the mortgage, which the complainants may have in the premises, (a)

 This decree was reversed by the present supreme court, sitting in equity, bs» *22 fore Hurlbut, McCoun and Edwards, Justices, January 15, 1849. They held, 1st, that there was no fraud shown in obtaining the order to mortgage ; and 2nd, that the authority to execute the mortgage, was properly exercised in giving it to the contractor for the price of the buildings to be erected. The defendants appealed to the Court of Appeals, where the cause is still pending.